(73 South. 678)

No. 21250.

## MURPHY v. STANDARD OIL CO. OF LOUISIANA.

(Dec. 11, 1916. Rehearing Denied Jan. 15, 1917.)

*(Syllabus by Editorial Staff.)*

1. MASTER AND SERVANT ⊘═══239—LIABILITY FOR INJURIES.

Where the employé of an oil company adopted unnecessarily an admittedly dangerous method of throwing in the clutch of a gas engine which ran the pump of an oil well, the employer was not liable for his injuries.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 749, 750; Dec. Dig. ⊘═══ 239.]

2. MASTER AND SERVANT ⊘═══278(5)—MANNER OF INJURY—SUFFICIENCY OF EVIDENCE.

In an action for injuries received by an oil company's employé when throwing in the clutch of a gas engine which ran a well pump, evidence *held* insufficient to sustain the jury's finding that plaintiff was injured in such manner that the employer was liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 961; Dec. Dig. ⊘═══278(5).]

Appeal from First Judicial District Court, Parish of Caddo; R. D. Webb, Judge.

Action by Samuel J. Murphy against the Standard Oil Company of Louisiana. From a judgment for plaintiff, defendant appeals. Judgment set aside, and suit dismissed.

J. C. Pugh & Son, of Shreveport, for appellant. Joseph H. Levy, Stewart & Tanner, and Charles F. Crane, all of Shreveport, for appellee.

PROVOSTY, J. The lower part of one side of plaintiff's face was smashed to a pulp while he was in the act of "throwing in" the clutch of a gas engine which ran the pump of one of the wells in the oil field of the defendant company.

Immediately after the accident he was found lying unconscious on the ground outside of the engine house, 5 or 6 feet from the engine, opposite an opening in the wall of the engine house where several of the 12-inch upright planks of which the wall was composed had been removed.

He was carried to the gallery of the warehouse of the defendant company close by, about 100 feet distant, and laid on a cot. He remained there several hours before he could be transported to the railroad station, to be taken to the sanitarium at Shreveport. During this time the people from the houses in the vicinity congregated about where he was and about the place of the accident; and, very naturally, the subject of their conversation was the accident and the manner of it—as to which plaintiff was not in a condition to furnish any information. Immediately after the accident, Romero, who was the keeper of the warehouse, Schimmel, a driller, and a man named Boyer, inspected the place to try to find out how the thing had happened; and, doubtless, others did the same thing, among whom was plaintiff's witness Hortman, who was there at the same time as Romero, Schimmel, and Boyer.

[1] The latter three say that in this opening in the wall, opposite which plaintiff was found, there was a long piece of 2-inch iron pipe with one end resting upon the engine and the other upon the ground outside, in exactly the position in which such a piece of pipe would likely be if a person standing outside had been using it in the manner of a battering ram for "throwing in" the clutch with; and that the end resting upon the engine was bent as if it had been caught in the spider of the engine. They concluded that plaintiff must have been standing outside of the engine house and poking or bumping the clutch with this piece of pipe, and that one end of the pipe had gone too far and slipped into the spider, with the effect that the other end,

which he was holding, had whipped around and struck him in the face and knocked him down. If this was the manner of the accident, the defendant company is not liable, for the responsibility then rests with plaintiff himself for having adopted unnecessarily this admittedly dangerous method of putting on the clutch.

[2] Plaintiff says that he was inside, standing upon the sill of the pillar post of the engine, using a short piece of pipe as a lever for throwing the clutch, by pushing it from him, when the pillar post "careened" (by which we understand gave way and went out of its perpendicular), owing to the rotten condition of the sill, and he fell forward, his face striking against the shoes of the fast revolving clutch; that he retained consciousness just long enough to crawl outside of the engine house through this opening in the wall, and then knew nothing further until he revived in the sanitarium.

For corroborating his statement that he was inside of the building, plaintiff produces the witness Hortman, who made an inspection of the place immediately after the accident, and another witness, named Jenkins, who made an examination two days later. These two men, who are laborers in the oil field, testify to have seen traces of blood inside of the building. Their testimony in so far as bearing upon these traces of blood is, in full, as follows:

The witness Hortman testified as follows:

Examination in chief:
"Q. Now how long after the accident were you at Hardy One? A. About two hours after the accident. Q. Now show the jury what the condition of the tail post, and the tail post sill was; just come and show it to them. A. Well, it looked like it was careened out in this condition. (Witness illustrates.) Q. How was the tail post sill? A. Turn-up in this way. (Witness illustrates.) Q. Now, I will ask you if you noticed anything on the sill of the foundation? A. Yes, sir. Q. What did you notice? A. Blood. Q. Leading to where? A. Well, from the clutch; from the tail post sill to the outside. Q. To the opening? A. Yes, sir."

Cross-examination:
"Q. How many times have you gone to Mr. Levy's office to talk this case over? A. I don't know of having been up there but once. Q. About when was that? A. Well, I cannot state exactly, but it was along about the 30th. Q. Now, how did they know that you—how did they find out that you knew about this blood scattered around there on the ground and on the post? A. Well, they knew I knew it. Q. How did they know it? A. By me being there. Q. Who did you see there at the time—name of the parties? A. Bert Boyer and De Loe. Q. Did you see Gus Bartz there? A. No, sir. Q. Who else? A. Mr. Romero. Q. Now, I presume you showed them this blood scattered around on the floor and on the posts there? A. No, sir; I didn't have no conversation with them. Q. Didn't call their attention to the blood there? A. No, didn't say anything to them about it. Q. You kept that a secret? A. I certainly did. Q. Now, look at me, don't look over there; how long did you keep that a secret? A. Quite a long time. Q. How many months? A. In the neighborhood of six or seven months. Q. Kept it a secret? A. Yes, sir. Q. Why is it you didn't tell them before? What did you want to keep it a secret for? A. I thought that was my business and not anybody else's. Q. You went up around there where a man had almost lost his life, and there were other people up there, trying to find out how the accident happened, and you went and nosed around in there, and found those blood spots scattered all around over the ground? A. I could see them on the clutch and on the tail sill. Q. There other people were there and you never said a word about it? A. No, sir. Q. Kept it a secret for six or seven months? A. I didn't see that I had any room to say anything. Q. You kept it a secret, to yourself? A. Yes, sir. Q. I said you kept it a secret for seven months or at least that is what you said, that you kept it a secret for seven months after the accident happened? A. Yes, sir. Q. Now that is straight. Seven months after the accident you kept it a secret, and didn't tell anybody? A. Yes, sir. Q. Now that is correct? A. Yes, sir. Q. Now who did you first tell? A. I don't know; there was different ones talking, and I just got into the conversation. Q. Now, do you know how long it was after the accident before you had an interview with Mr. Murphy? A. I can't just exactly state. Q. How many days or months? A. Well, something like two or three months. Q. Now he is the man that was injured? A. Yes, sir. Q. Now was there a great deal of discussion up there, after this thing happened? A. Well, I guess there was up at that place, but I didn't go about there. Q. Now you said a while ago there was some discussion at the boarding house about how it happened? A. Yes, sir. Q. Now are you friendly with Murphy? A. Yes, I am friendly with him. Q. Now will you please explain to the jury why it was you did not tell Murphy about the blood stains until two or three months aft-

er the accident had happened? A. I did not see him until then. Q. Then did you talk with him? A. Yes, sir. Q. Talked about the case? A. Well, he never mentioned nothing about the case. Q. You knew that he had a case? A. Well, after he talked to me a while, he asked me to give him a statement. Q. Now how long was that after the accident happened? A. Two or three months. Q. When you gave him the statement? A. Yes, sir. Q. Do you tell this jury that you didn't tell Murphy then about seeing those blood stains on that floor? A. No, sir; I did not tell him. Q. Still kept it a secret? A. Yes, sir."

Redirect examination:

"Q. Now, Mr. Hortman, when was the first time you heard that Mr. Murphy was going to bring a suit against the Standard Oil Company? A. Well, in October, about two or three months after the accident. Q. Did you tell him about blood stains then, after you heard that he was going to bring suit? A. I did not. Q. When did you tell him about it? A. Well, it was a long while after that; I don't just remember the date. Q. Did Murphy come to you for a statement? A. Yes, sir."

The witness Jenkins testified as follows:

"Q. Where do you reside? A. Oil City. Q. Are you acquainted with the well-known Hardy One, belonging to the Standard Oil Company? A. I am. Q. How far is your residence from it? A. About 200 yards. Q. I believe you work in the oil field, yourself, do you not? A. I do. Q. What kind of work? A. Roustabout. Q. Do you remember the occurrence of an accident that happened to S. J. Murphy, in August, 1913? A. Yes, sir. Q. How soon after the accident did you visit the well? A. A couple of days afterwards. Q. State to the jury how long it was after the accident that you visited that well. A. Two days afterwards. Q. Did you go into the engine room? A. Yes, I did. Q. State to the jury what you were doing in that engine room. A. Well, I was examining some new repairs that had been done lately. Q. What did you see in the engine room? A. I was examining these repairs, and I also seen some blood stairs on the tail sill, or the sill where the clutch sets. Q. Where did these blood stains lead to? A. Out towards the tank. Q. Saw the blood stains on the tail sill and on outside leading to the tank? A. Yes, sir."

Cross-examination:

"Q. Now who was present with you when you made your investigation—who was present when you were there looking around for blood stains? A. I never seen any one. Q. You were there alone? A. Yes, sir. Q. What made you stop at this place? A. Well, I just taken it on myself to go up there and see where the man got hurt. Q. Now, was it running? A. I don't know whether it was running or not, now. Q. Who was in charge when you were there? A. I don't recollect. Q. You don't know who was there? A. No, sir. Q. Any way, you made your investigation alone; now, who did you tell or when did you first tell about seeing these blood stains up there, and who did you first tell about it? A. I don't recollect who it was. Q. Well, now how long was it before you told it, how many months? A. Well, it was a month, about. Q. Who did you tell? A. I was talking with a fellow. Q. Who was the fellow? A. The man that got hurt. Q. Now, where did that interview take place? Don't look over there; look at me. Where did that interview take place? A. Taken place here in Shreveport. Q. Whereabouts? A. Well, I don't know whereabouts exactly; I don't know the name of the place. Q. Now was anybody present? A. No, sir. Q. Who else was present with you and Mr. Murphy? A. No one. Q. Now, that was after Murphy was able to go around? A. That was when he was able to go around. Q. He was walking around town when you told him about it? A. Yes, sir. Q. Told him you found the blood stains there? A. Indeed I did. Q. Now, you say that was about a month after the accident happened? A. Well, somewhere about there; I don't remember just when it was. Q. You didn't go to see him in the sanitarium, where he stayed over two months, and tell him about it there, did you? A. No, sir. Q. Now, who was present with Mr. Murphy when you told him this? A. Not any one. Q. Do you know where that interview took place? A. No, sir. Q. Don't you know in what part of town it was? A. No, sir; just in the city here. Q. Now, what were you doing when you told him, just walking up and down the streets, or what? A. On my way home. Q. On your way home? A. Indeed I was. Q. Now, what made you tell him about the blood stains? A. Well, I found out I was to be summoned to court and that is what it was for. Q. Now, about a month after this happened, you found that you were going to be summoned to court? A. Yes, sir. Q. How did you find out that you were going to be summoned in this case? A. He told me I was going to be summoned. Q. That was after he brought his suit? A. I suppose it was. Q. Now after he brought his suit and he told you that he was going to summons you, what did he tell you he was going to summons you for? A. I don't recall. Q. You all just had a talk, and he told you that you were going to be summoned in the case, and after he told you you would be summoned as a witness, then you told him about seeing these blood stains? A. No, sir. Q. But wasn't it after he told you he was going to summons you that you told him about seeing the blood stains on the inside of the house? A. Yes, sir. Q. Is that correct? A. Yes, sir. Q. Well, how did he know, if you had never told him or anybody else what you had seen there, how did he know, if you had never told anybody about it, you say you never told anybody else? A. Not that I recall. Q. Now you say you were on your way towards the depot when you told him that? A. Yes, sir; I was on my way to catch a train. Q. And he

was just walking around or just walking along? A. Well, he was standing on the corner down there. Q. What corner? You say down there. A. I don't know the name of the place. Q. Did he walk along a piece with you or did you stop and talk? A. Well, I stopped and talked with him a few words. Q. And he told you that he was going to summons you as a witness? A. Yes, sir. Q. Now, has it not been within the last six months that you told him that? A. No, I don't recall whether it was or not. Q. Now, really, you don't know when you told him, do you? A. No, sir. Q. Well, how come you to say about a month? A. Well, I said about a month afterwards, as well as I could recollect; I said about a month. Q. Now who were you working for at the time you told him? A. I was not working for any one; I was laid up. Q. Who had you been working for? A. Working for the Standard. Q. Who are you working for now? A. Pine Oil Company. Q. Now about how much blood did you discover when you were making this investigation? A. Well, enough to tell it was blood. Q. Did it cover a place as big as the back of your hand, or as big as your finger, or what? A. Well, about the size of a dollar, I suppose. Q. Where was the blood located, on the ground or on the sill? A. On the sill. Q. Only one spot? A. Several spots. Q. Large as dollars? A. Yes, sir. Q. How many spots of blood did you see? A. One or two spots. Q. And they were on the sill? A. Yes, sir. Q. How many of those blood spots led on the outside? A. Well, I saw them on the sill; they were on the sill where the clutch or the sill of the clutch to the sill of the engine house, and the spots led to the tank. Q. You saw the spots in two places on the sill? A. On the clutch sill and the engine house sill, and the spots led out to the tank. Q. How many spots were there? A. A couple. Q. One on the engine house sill and the other on the clutch sill? A. Yes, sir. Q. Now how big was the spot on the outside sill? A. About the size of a dollar. Q. Now, is it correct that those were the only two spots you saw? A. Yes, sir. Q. And the first time you ever told Mr. Murphy about it was when he summoned you as a witness, or that is, he told you that you would be summoned as a witness at court and then you told him of the blood stains you had seen; how come you to tell him? A. I don't recall now, how come. Q. Did he ask you if you didn't see blood there? A. I don't recall."

Redirect examination:

"Q. When Mr. Murphy was talking with you that day, did he tell you that he had a case? A. He didn't exactly tell me, but he told me I would be summoned to court on a case. Q. Now this estimate you made of a month, is that correct or is it a guess? A. It is according to a guess, as near as I can recollect."

From the testimony in chief of these witnesses one would suppose that they had seen a course of blood marking the progression of plaintiff as he crawled out of the building; whereas this "blood" is finally reduced on the cross-examination of Jenkins to two spots of the size of a dollar. Jenkins made his examination two days after the accident, when the spot of blood in the dust outside where plaintiff had lain had been trodden out and obliterated; and Jenkins does not pretend to have seen it. So that the blood which "led" to the outside consisted of the couple of dollar spots.

An air of improbability is cast upon the testimony of these two witnesses by what they say in regard to having kept their said discovery a secret. One of them even from plaintiff himself when the latter asked for a statement. The manner in which plaintiff had received his injuries, which he himself was not in a condition to explain, excited, very naturally, the curiosity of the large number of persons attracted to the place, and the natural thing for Hortman to have done would have been to talk about these alleged blood spots. It would have disproved the other theory, which was being accepted— that plaintiff when he received his injury was standing on the outside. And if these blood spots had really been there it would seem that they would have been seen by a large number of persons, and that these persons could have been called to testify on that point.

Whereas the three witnesses above named who made an inspection for the purpose of discovering the manner of the accident did not see these spots, nor did defendant's foreman Bartz and the superintendent De Loe who made a close inspection a few hours later. These men would have been in no manner responsible for the accident even if plaintiff had been standing inside of the building when hurt; hence they had no motive for testifying falsely. They are not unfriendly to plaintiff; and one of them, Mr.

Romero, was no longer in the employ of defendant when testifying.

Plaintiff's own testimony is very precise and entirely consistent with itself from beginning to end; but on many points it is contradicted by the five witnesses already named, and by others, and it does not accord well with probabilities: First, that plaintiff should have retained consciousness after such a terrific blow, and then should have retained it only long enough to have crawled to the place where he was found. Then that this long iron pipe should have been found resting upon the engine. Nor is it very clear from the model which plaintiff himself made of the engine, and from the photographs of the place, how it was possible for him to have received the injuries in question in the manner he claims. Whereas the theory of a blow from the long iron pipe harmonizes exactly with the situation.

He was terribly injured, and excites sympathy; but the responsibility does not lie upon defendant. The case appears to us to be clearly with defendant; so much so that we are at a loss to understand how the jury could have reached a different conclusion from anything in the record.

The judgment appealed from is set aside, and the suit is dismissed at the cost of plaintiff in both courts.